**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Irving M. DROBNY, Defendant–Appellant.**

No. 90–8459.

United States Court of Appeals, Fifth Circuit.

March 16, 1992.

Julius L. Echeles, Chicago, Ill., for defendant-appellant.

Sara Criscitelli, Sp. Counsel, John D. Arterberry, Sr. Litigation Counsel, U.S. Dept. of Justice, Washington, D.C., LeRoy Morgan Jahn, Asst. U.S. Atty., Ronald F. Ederer, U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before GOLDBERG, SMITH, and DUHÉ, Circuit Judges.

DUHÉ, Circuit Judge:

Irving Drobny, who was convicted of securities fraud, brings this collateral attack on his conviction. He says that the district court which convicted him lacked jurisdiction because any misrepresentations he made came five days after the securities sale closed. He also complains of ineffective assistance of counsel. We find no merit in his appeal and affirm the district court's denial of Drobny's motion.

## I.

■ Because the alleged scheme and the legal issues involve complicated questions under the securities law, we recite the facts in some detail. On collateral review, we view the facts in the light most favorable to the verdict. *United States v. Marcello*, 876 F.2d 1147, 1149 (5th Cir.1989). We draw the following background facts from our opinion on direct appeal, *United States v. DeVeau*, 734 F.2d 1023, 1024–26 (5th Cir.1984), *cert. denied*, 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985). We also reiterate the procedural history carefully because a host of procedural complexities riddle this case.

### A.

The scheme began with Frederix DeVeau. After being released from prison for a prior conviction, he entered the Department of Justice Witness Protection Program, took a new identity, and moved to San Antonio, Texas. In February 1981, DeVeau acquired control of the Electric Car Company, promising to pay the sellers from whatever profits he could make. The company was not viable, though, and it virtually ceased operations by late 1981.

In early 1982, DeVeau began efforts to buy Jet Industries Inc., which made electric-powered vehicles. Jet was in serious financial trouble but was cash rich. DeVeau planned to merge Jet and Electric Car Company.

During his negotiations with Jet, DeVeau concealed his past criminal record, and he lied about his background and financial re-

sources. Eventually he and Jet agreed that he would buy twenty percent of Jet's stock for $1.2 million, with $300,000 as a down payment, and become its chief executive officer. DeVeau arranged to borrow $300,000 from the Plaza Bank, negotiating with its president, Roy Diefendorf. The closing was scheduled for February 12, 1982.

At the closing Jet learned that its own assets would be used to secure DeVeau's loan, and it aborted the closing.

After further negotiations, the parties reached another agreement. The purchase price remained the same, but the down payment was doubled. Mr. Diefendorf arranged for some Plaza Bank depositors personally to lend DeVeau $300,000. DeVeau was still short $300,000. Nevertheless, the closing was rescheduled for April 8, 1982.

Irving Drobny then arrived on the scene. He was the beneficial owner of a large block of Electric Car Company stock, and he wanted the sale consummated so the stock price would improve and a defaulted company loan could be repaid. He borrowed from Joseph Rosin the $300,000 that DeVeau still needed. Mr. Rosin was to receive a $30,000 "fee" for the short-term use of his money. Rosin told Drobny not to tender the check until Drobny had another $330,000 certified check in repayment. DeVeau was to pay Drobny $200,000 as a "finder's fee" for locating this $300,000.

On April 7, 1982, Drobny met DeVeau and tendered Mr. Rosin's check. Later that day, DeVeau gave Drobny a series of Electric Car Company checks to repay Mr. Rosin and to cover part of Drobny's $200,-000 fee. DeVeau told Drobny that the checks were drawn on an account with insufficient funds, but that DeVeau would cover the checks from a family trust fund. Drobny accepted these checks for his fee but required a cashier's check for Mr. Rosin. (Drobny's insistence was fortunate for Mr. Rosin; later, when Drobny tried to cash this series of checks, they bounced.) DeVeau agreed to give a cashier's check to Drobny, which Drobny could deliver to Mr.

Rosin. Again, DeVeau said he would get the money from his family trust fund.

On April 8, the closing took place as planned.

On April 9, DeVeau told Drobny that the trust fund money had not yet arrived, and Drobny returned to his home in Chicago. On April 11, Drobny went back to Austin for a Jet board meeting scheduled for April 12th; he and DeVeau had been elected to the board after the acquisition of Jet. Still, no trust fund money had arrived. Together they departed for San Antonio.

On April 13, DeVeau opened a bank account at the Plaza Bank with $400,000 of Jet money. DeVeau then gave Mr. Diefendorf $300,000, to repay the bank depositor's loans. Later that afternoon, DeVeau returned to the bank with Drobny. The trust fund money was still not there, although DeVeau had said it was. Drobny then discovered that DeVeau had repaid the $300,000 to Mr. Diefendorf.

Drobny insisted on buying a cashier's check from Plaza with his own check in order to repay Mr. Rosin. At first, Mr. Diefendorf refused, but Drobny assured him that Drobny was wealthy, that he was a director of the Chicago bank where his account was, and that his check was good. These representations were untrue. Mr. Diefendorf issued the $330,000 cashier's check.

Drobny returned to Chicago and gave Mr. Rosin the cashier's check. Over the next few days, Mr. Diefendorf called Drobny several times to reconfirm that Drobny's check was good. Drobny falsely claimed that it was, and he made no efforts to cover it. Mr. Diefendorf went to DeVeau and asked DeVeau to cover it if it was returned. DeVeau tendered a $350,-000 check, from Jet, for this purpose.

On April 23, Drobny's check was returned to the Plaza Bank because Drobny's account had insufficient funds. Mr. Diefendorf used the Jet check to cover Drobny's bounced check. Later, Drobny discovered that his check had been covered, and he asked that his check be returned to him.

Soon, DeVeau had misappropriated most of Jet's liquid assets. He paid $165,000 of Drobny's $200,000 finder's fee with Jet funds. The Jet board discovered DeVeau's improper use of corporate funds, and the criminal prosecution followed.

## B.

A grand jury returned a thirteen-count indictment against DeVeau and Drobny. After a four-week trial, the jury convicted Drobny on one count.[1] Thus, he was convicted of a violation of section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 of the Securities and Exchange Commission,[2] which is made a criminal offense by 15 U.S.C. § 78j(b).

The provisions under which Drobny was convicted apply only to fraud "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b); 17 C.F.R. § 240.-10b–5. The prosecution asked that the district court instruct the jury on the "in connection with" element of the crime. The district court told the jury that "in connection with" is an essential element of the charged crime, but the court did not expound further on the meaning of the phrase. Drobny did not object at trial to the instruction that the district court delivered, but he did object to the omission of an "in connection with" instruction in his motion for a new trial. The district court denied his motion, and Drobny appealed to this Court.

Drobny raised two issues on appeal. He objected to the jury instruction on "willful blindness," and he contended that the evidence was insufficient for a reasonable jury to find that he knew that Jet funds would be used to cover his check. Both grounds for reversal were rejected. *De-Veau*, 734 F.2d at 1028–29. He did not complain of the omission of an "in connection with" instruction. *See id.* When he failed to gain relief from this Court, he filed a petition for a writ of certiorari, and he did raise the "in connection with" issue.

The Supreme Court denied certiorari. *Drobny v. United States*, 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985).

Eventually Drobny started to serve his sentence. On September 11, 1989, after being released on parole, he filed a Motion to Vacate and Set Aside Sentence, pursuant to 28 U.S.C. § 2255. He argued that he had been convicted of securities fraud even though his misrepresentations were not "in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5. On May 31, 1990, the district court denied the motion. Drobny's parole ended in July. He now appeals the denial of his § 2255 motion, and raises for the first time in this appeal an issue of ineffective assistance of counsel and an evidentiary question. He moved this Court to hold his appeal in abeyance while he returned to the district court to litigate the ineffective assistance and evidentiary claims, but we denied his motion.

## II.

We must address a number of procedural issues first. Primarily, we must consider whether Drobny is procedurally barred from bringing the current attack on his conviction.

## A.

 Collateral review is fundamentally different from a direct appeal. *United States v. Frady*, 456 U.S. 152, 165, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982). As our Court, sitting en banc, recently said,

A defendant can challenge his conviction after it is presumed final only on issues of constitutional or jurisdictional magnitude, *Hill v. United States*, 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962), and may not raise an issue for the first time on collateral review without showing both 'cause' for his procedural default, and 'actual prejudice' resulting

---

**1.** He was convicted on Count II of the indictment, which alleged that he and DeVeau fraudulently used Jet assets to cover Drobny's $300,000 check to the Plaza Bank as part of the overall scheme for DeVeau to purchase 1.4 million shares of Jet stock.

**2.** 17 C.F.R. 240.10b–5 (1991).

from the error. *Frady,* 456 U.S. at 168, 102 S.Ct. at 1594.

*United States v. Shaid,* 937 F.2d 228, 232 (5th Cir.1991) (en banc) (footnote omitted), *cert. denied,* —— U.S. ——, 112 S.Ct. 978, 117 L.Ed.2d 141 (1992). If the alleged error is not constitutional or jurisdictional, "the defendant must show that the error could not have been raised on direct appeal, and if condoned, would result in a complete miscarriage of justice." *Id.* at 232 n. 7 (citing *United States v. Capua,* 656 F.2d 1033, 1037 (5th Cir. Unit A Sept. 1981)). If the defendant does not meet this burden of showing cause and prejudice, he is procedurally barred from attacking his conviction.

■ To invoke the procedural bar, however, the government must raise it in the district court. *United States v. Marcello,* 876 F.2d 1147, 1153 (5th Cir.1989). " 'As a general principle of appellate review, this Court will not consider a legal issue or theory not presented to the [federal district court].' " *Washington v. Watkins,* 655 F.2d 1346, 1368 (5th Cir. Unit A Sept. 1981) (State waived its cause-and-prejudice argument by not raising it in habeas corpus proceeding before the federal district court) (quoting *Noritake v. M/V HELLENIC CHAMPION,* 627 F.2d 724, 732 (5th Cir. 1980)), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982). The Supreme Court has affirmed one of our cases holding that the government waived the cause-and-prejudice standard. *Smith v. Estelle,* 602 F.2d 694, 708 n. 19 (5th Cir.1979), *aff'd,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).

■ After a careful review of the record, we conclude that the Government did not raise the procedural bar issue in the district court.[3] There is only one passage in one government pleading before the district court that could possibly be construed as raising the issue. We quote it in full:

Drobny concedes that this issue was not raised in his direct appeal but seeks collateral review now by characterizing

his claim as one to correct a "jurisdictional" defect. Stripped of its gloss, however, Drobny's claim is revealed to be nothing more than an artful attempt to modify the sufficiency of the evidence argument that was rejected in his direct appeal. Moreover, Drobny advanced an almost identical "in connection with" argument in his unsuccessful petition for a writ of certiorari.

Even if the court chooses to consider Drobny's flawed jurisdictional argument, its underlying premise, that Drobny was not convicted of a fraud "in connection with" the purchase or sale of Jet securities, is directly contradicted by the trial record.

1 R. 55. This passage is too equivocal to raise the procedural bar. In the first sentence of the quotation, the Government seems to say that the issue raised on collateral attack was not raised on direct appeal. In the very next sentence, however, the Government seems to say that the issue really was raised on direct appeal.

The district court certainly did not understand that the Government raised this issue. Neither the report and recommendation of the magistrate judge, nor the order of the district court itself, addresses the procedural bar. Both reject Drobny's claims on the merits, without even mentioning the possibility of a procedural bar. *See* 1 R. 2–3, 38–46. We conclude that the Government's pleading cannot fairly be read to raise the procedural bar. For that reason, we cannot hold Drobny procedurally barred from attacking his conviction on collateral review, and we must address his contentions on whatever merits they have.

**B.**

Before we can decide the merits, though, we must determine what standards of review apply. Drobny filed his motion in the district court pursuant to § 2255, which applies only to those "in custody." At the time, Drobny was on parole. The Government concedes that one on parole is "in

---

3. The parties have not briefed the issue whether the Government has defaulted on the question of procedural bar by not raising it before. We,

therefore, are without the benefit of briefs on this subject.

custody" within the meaning of § 2255. The Government instructs us that all issues raised by the § 2255 motion are accordingly addressed under a § 2255 standard of review, even though the Defendant is no longer on parole and thus no longer "in custody." *Cf. United States v. Spawr Optical Research, Inc.*, 864 F.2d 1467, 1470 (9th Cir.1988) (§ 2255 motion not necessarily moot after movant is released), *cert. denied*, 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989). We will follow the Government's instruction, without deciding which standard of review is appropriate for a § 2255 motion being reviewed after the movant's release.

 Drobny now raises claims that were not included in his § 2255 motion. When a defendant is no longer in custody, a writ of error *coram nobis* is the appropriate procedural vehicle for attacking a conviction. The ancient *coram nobis* remedy survives under the All Writs Statute, 28 U.S.C. § 1651. *United States v. Morgan*, 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248 (1954); *Marcello*, 876 F.2d at 1149 n. 1, 1154. A petitioner may obtain this writ only upon "demonstrat[ing] that he is suffering civil disabilities as a consequence of the criminal conviction and that the challenged error is of sufficient magnitude to justify the extraordinary relief". *Marcello*, 876 F.2d at 1154. This more stringent standard of review applies in the case at bar to the issues raised only after Drobny's release from parole (i.e., those issues not raised in his § 2255 motion).

Drobny has not actually filed a piece of paper styled "Petition for a Writ of Error *Coram Nobis*." Rather, he has raised his ineffective counsel and evidentiary claims for the first time before this Court, after his parole ended. We will treat these issues, therefore, under the *coram nobis* standard. His other claims will be reviewed under a standard more favorable to him. The § 2255 standard is stringent but not as demanding as *coram nobis;* furthermore, the § 2255 standard has lost its sting because the Government did not raise its cause-and-prejudice arguments in the district court.

## III.

 We can easily dispose of the *coram nobis* claims. Drobny argues that his trial counsel was constitutionally inadequate for failing to object to a series of questions put to Drobny. Under *Morgan*, if Drobny could prevail on his ineffective assistance of counsel claim, he would be entitled to relief even under the rigorous standards of *coram nobis*. *Morgan*, 346 U.S. at 512, 74 S.Ct. at 252 (construing *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)).

We evaluate his attorney's performance with regard to prevailing professional norms, employing the two-prong test enunciated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, we determine whether the attorney's performance was deficient, giving "a heavy measure of deference to counsel's judgment." *Green v. Lynaugh*, 868 F.2d 176, 178 (5th Cir.), *cert. denied*, 493 U.S. 831, 110 S.Ct. 102, 107 L.Ed.2d 66 (1989). Second, we determine whether even a deficient performance resulted in actual prejudice to the defendant. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

 As discussed above, we generally do not address claims raised for the first time on appeal. Seldom can we fairly evaluate a claim of ineffective assistance of counsel without a factual record first being developed by the district court. In exceptional cases, however, when the record sufficiently details the allegations of ineffective counsel, we will address the claim on the merits. *United States v. Kinsey*, 917 F.2d 181 (5th Cir.1990).

 Drobny's is one such exceptional case; we can perceive from the record before us that his claim of ineffective assistance of counsel is meritless. The prosecutor had asked Drobny a series of questions about whether he took bribes while he was a state official. Drobny vehemently denied each question, but the accusation was implicit in the questions. Drobny was able to testify, however, that as a state official he put one of the supposed bribe

payers out of business completely. He also told how the United States Attorney had conducted a full investigation of the state government and had never suggested any illegal conduct by Drobny. 13 Tr. 1897–1901. Moreover, on redirect examination, Drobny's trial counsel elicited from him testimony on his distinguished career. *Id.* at 1973–78.

Drobny's complaint is that his counsel did not insist that the prosecutor call certain rebuttal witnesses. We find, however, that this record does not show constitutionally ineffective counsel. It shows that Drobny was a good witness on his own behalf, answering the prosecutor's questions not only with denials but with specific facts, and that his attorney rehabilitated Drobny as a witness. We cannot say that it was constitutionally ineffective for his counsel not to insist that the Government call witnesses to testify that Drobny did take the bribes. This decision may have been the better tactical move on the part of Drobny's trial counsel, but even if it were not, this strategic choice certainly does not run afoul of prevailing professional norms, especially when we defer to trial counsel's judgment.

## IV.

We now reach the heart of Drobny's argument. He notes that his lies to Mr. Diefendorf, and his later conduct, took place after the sale of securities was concluded. He argues that these acts cannot be "in connection with" the sale of securities. *See generally* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. We do not believe that this argument helps his cause.

### A.

First Drobny says that the Government did not prove the essential "in connection with" element and that the district court therefore lacked jurisdiction. This argument is simply wrong. District courts have jurisdiction over offenses against the laws of the United States. 18 U.S.C. § 3231. As the Supreme Court stated over three-quarters of a century ago, "nothing is clearer than that the district court, which has jurisdiction of all crimes cognizable under the authority of the United States, acts equally within its jurisdiction whether it decides a man to be guilty or innocent under the criminal law, and whether its decision is right or wrong." *Lamar v. United States*, 240 U.S. 60, 65, 36 S.Ct. 255, 256, 60 L.Ed. 526 (1916) (citation omitted). The indictment charged Drobny with an offense against the United States, and the district court had jurisdiction. What Drobny has actually raised by this argument, in the guise of a jurisdictional challenge, is a claim that the evidence was insufficient and that the jury was improperly charged.

### B.

■■■ To assess these arguments we must examine the substantive securities law. Rule 10b–5 states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1991). Significantly, this rule covers not only misrepresentations, but devices, schemes, or artifices to defraud; and acts, practices, and courses of business which could operate as a fraud.

■■■ We now turn to some of the case law interpreting Rule 10b–5 and its correlative statutes. Drobny relies on the Seventh Circuit rule that "misrepresentations made after an investor is legally committed

to a sale or purchase [of securities] cannot form the basis for a Rule 10b–5 action." *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1237 n. 7 (7th Cir.1988) (construing *LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 931–32 (7th Cir.1988)). We do not disagree with this principle, which Drobny contends has been adopted by other circuits as well. Appellant's Br. at 9 (citing *International Data Bank, Ltd. v. Zepkin*, 812 F.2d 149, 151–52 (4th Cir.1987); *Pross v. Katz*, 784 F.2d 455, 458–59 (2d Cir.1986); *Pittsburgh Coke & Chem. Co. v. Bollo*, 560 F.2d 1089, 1091 (2d Cir.1977); *Raschio v. Sinclair*, 486 F.2d 1029, 1029–30 (9th Cir. 1973)). We do not believe that the principle furthers Drobny's claim, however.

Drobny's mistake is that he focuses his argument only on the fraudulent acts he did after the closing. He ignores the fraudulent scheme, in which the jury found he participated, that started well before the closing. Drobny borrowed from Joseph Rosin the $300,000 that DeVeau still needed for the transaction to be consummated. Mr. Rosin was to receive a suspicious $30,000 "fee" for the short-term use of his money. DeVeau was to pay Drobny an even fatter and more suspicious "finder's fee" of $200,000 for locating the needed $300,000. Later, DeVeau gave Drobny a series of Electric Car Company checks to repay Mr. Rosin and to cover part of Drobny's $200,000 fee. All of these acts took place before the closing, and a rational jury could find beyond a reasonable doubt that they were part of a "device, scheme, or artifice to defraud ... in connection with the purchase or sale of any security." That Drobny did not lie to Mr. Diefendorf until after the closing does not immunize his earlier conduct.

### C.

■ We now address Drobny's argument that the jury was not properly instructed on the "in connection with" element. The trial judge read the jury both the securities fraud statute and the securities fraud rule. Both contain the "in connection with" language. The trial judge also told the jury that "in connection with"

is an essential element of the crime charged. 16 Tr. 251–53. This jury instruction is sufficient; the jury was told at least three times that it had to find that Drobny perpetrated his fraud in connection with the purchase or sale of securities. More than ample evidence at trial was adduced to prove this element. A rational trier of fact could conclude, from the evidence just recited, that the fraud was perpetrated in connection with the purchase or sale of securities. *See United States v. DeVeau*, 734 F.2d 1023 (5th Cir.1984), *cert. denied*, 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985). The conviction is proper.

### V.

For the foregoing reasons, we conclude that Drobny is not entitled to relief. Accordingly, the judgment of the district court is

AFFIRMED.